COURT OF APPEALS OF WEST VIRGINIA.                185

July Term,          Mears vs. Sinclair, et. al.              1865.

## 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

### ROBERT MEARS *vs.* JAMES SINCLAIR, *et al.*

#### July Term, 1865.

1. The home or domicil of the father is the domicil of the child; so also of a mother whilst a *feme sole*: but a guardian cannot fix the domicil of his ward; nor can a mother during coverture with a second husband take a child by the former husband from its native State, where it is domiciled, and carry it into another State thereby changing its domicil and altering the succession to its estate.

2. J. W. died testate in the county of *Brooke*, leaving a widow and two children, between whom he divided his estate equally. The widow qualified as guardian of the children, and married J. S. in 1851, and remained with him in *Virginia* two years when they removed to *Ohio* taking with them the two infant children of J. W. One of them, Mary A., died about two years after so removing. HELD:

   That the mother during coverture, who was also guardian, could not change the domicil of the infant heir of J. W., so as to alter the succession to her estate, and that it must be distributed according to the statute of descents and distribution of *Virginia*.

*John Williams*, a citizen of *Brooke* county in the State of *Virginia*, died testate in said county in February, 1845, seized of 280 acres of land in that county.

By his will he devised his lands to be sold by his executors, and then bequeathed his whole estate, after payment of debts, to be divided into three equal parts: one to his wife *Elizabeth*, one to his daughter *Mary Ann*, ten years old at his death, and the remaining third to his daughter *Emma Caroline*, who was three years old at his death.

By the will *Elizabeth* was appointed executrix, and her brother, *William Brown*, executor thereof, and the said *Elizabeth* and her father, *Oliver Brown*, were appointed testamentary guardians of said two daughters; and at the April term of the county court for *Brooke* county, 1845, the executrix and executor qualified as such, and the said *Elizabeth* qualified as guardian of the two children. *Oliver Brown* declined.

The said *Elizabeth*, as relict, continued to live on the farm after the death of her husband, and kept and maintained with her the two daughters, until the 25th of February, 1850, when she intermarried with *James Sinclair*, a citizen of the State of *Ohio*. *Sinclair* lived with his wife on the farm in *Virginia* and kept and maintained her and the two children until sometime in March, in the year 1851, when he removed to the State of *Ohio*, and took with him his wife, the said *Elizabeth*, and her two daughters.

On the 25th day of July, 1851, *William Brown*, executor, sold the land to *Sinclair*; and of the purchase money, 3,649 dollars and 50 cents was by said executor and *Sinclair* and wife, set apart as the share of each of said children, and each share, secured by bond of said *James Sinclair* and a deed of trust on said land; the bond for *Mary A.'s* share falling due at her majority, to-wit, on the 18th of July, 1856; and in like manner the bond for *Emma C.'s* share falling due at her majority, 1st of February, 1863. Both bonds payable to the executor.

After the death of *Mary A.*, the land was sold by order of court made in the causes for 8,000 dollars; which sale was made on the      day of      1857.

*James Sinclair* maintained, schooled and clothed the said *Mary A.*, from February, 1850, until her death—the 6th of July, 1853, being then about eighteen years old. During most of the time she was afflicted with a scroffula, that kept her exceedingly feeble and most of the time helpless, and finally resulted in her death. And during all the time *Sinclair* acted the part of an affectionate father, and on all occasions was attentive and diligent, and employed at various times consulting physicians, and at one time took her to *Cincinnati* for medical aid and consultation.

The maintenance he afforded and the things he procured and money expended for her were such, considering her estate, position in society and physical condition, as were absolutely necessary. Of all these things *Sinclair* made an account amounting to 1,504 dollars, none of which was paid to him.

COURT OF APPEALS OF WEST VIRGINIA. 187

July Term,                Mears vs. Sinclair, et. al.                1865.

This account, *Sinclair*, being in necessitous circumstances, sold to appellant, *Robert Mears*, and received the cash therefor.

At the death of *Mary*, her mother claimed the whole transaction, relative to said *Mary* and her interest in her father's estate, to be a *Virginia* transaction, and that she, as mother, was entitled to succeed to one-half of *Mary's* estate, after debts were paid, as joint heir with *Emma C.* In which case, if *Mary's* estate was indebted the aforesaid 1,504 dollars, would leave an amount, including interest, of 2,944 dollars and 64 cents for distribution, of which 1,472 dollars and 32 cents is the share of said *Elizabeth* as heir of *Mary*. This inheritance or distributive share she, the said *Elizabeth*, with the concurrence of her husband, sold to the appellant for cash and received the money.

*Sinclair* also maintained, clothed and schooled in a manner suitable to her estate and condition, *Emma C.*, from the 25th of February, 1850, until her marriage with one *C. C. Baakee.* The cost of this maintenance amounted to 1,309 dollars.

Chancery suits having been brought in the circuit court of *Brooke* by sundry attaching creditors against the interest of *James Sinclair* in the farm on which the widow lived, known as the "half moon farm," after he moved to *Ohio*, the appellant *Mears* obtained leave to file his answer therein, when he set up the claim of *Sinclair* for the maintenance of the children, which had been assigned to him, and also the interest of the wife of *Sinclair* to the distributive share of the estate of the deceased child, *Mary A.*, which had also been assigned him by *Sinclair* and wife. The circuit court rendered a decree declaring that the estate of the deceased child must be distributed according to the law of descents and distributions of *Ohio*, where the child resided at the time of her death, which gave the whole of her estate to her sister, *Emma C.*, to the exclusion of the mother; and also disallowed the residue of the appellant's claim for maintenance, &c., upon the ground that the proceeds of the "half moon farm" did not discharge the indebtedness of *Sinclair* to the estate of his wards, whereupon *Mears* appealed to this court,

188    COURT OF APPEALS OF WEST VIRGINIA.

July Term,          Mears vs. Sinclair, et. al.          1865.

*Langfit* and *McKennan* for the appellant, insisted upon the following points:

*Elizabeth Williams* by her marriage with *James Sinclair* became " *civiliter mortuas,*"—her civil existence being merged in that of her husband, *James Sinclair*. She could do nothing *sui juris*, but her husband acting in her room and stead had, having performed the duties and services, a right to charge *Mary A.* and *Emma C.* for their respective maintenance, for money paid out for clothing, education, necessary traveling and medicine, and medical and surgical attendance. Code, (1860) page 588, § 7. Sto. Eq. Ju., § 1341; 1 Madd. Ch., page 324; and father or mother being poor, (*a fortiori* the step father being poor) will be liberally allowed for maintenance. Sto. Eq. Ju., § 1355.

But the statutes of *Virginia* prior to 1850 did not permit a guardian *proprio marte* to apply any of the principal of the ward's estate to his maintenance; but must first obtain an order of court. R. C., page 407; § 9 and page 410, § 26. *Myers* vs. *Wade*, 6 Rand. 444. *Broadus* vs. *Rosson*, 3 Leigh 12, 24, 28, 29. *Foreman* vs. *Murray*, 7 Leigh, 412 and 417, per *Tucker*. *Armstrong* vs. *Walkup*, 12 Gratt., 608, 613: and maintenance will be allowed although an express promise not to charge be made. *Armstrong* vs. *Walkup*, 9 Grat. 272–3, 375. During all time in *Virginia*, while the guardian had no right to apply any part of the principal of his ward's estate to his maintenance, however necessary, yet the courts at all times had that power, and exercised it on all necessary occasions. And now, what the guardian could not do before without an order of court, he may now do *proprio marte.* Code, page 588, § 8; *Hooper* vs. *Royster*, 1 Munf. 119.

It is not requisite that the person maintaining infants, and charging therefor, should have qualified as guardian. *Anderson* vs. *Thompson*; 11 Leigh, 439–40, 458–59. *Jackson* vs. *Jackson*; 1 Gratt., 143–4–5, 150.

But although the guardian may charge for maintenance of ward, yet he is not bound to do so, for, although he be insolvent, he may perform the service as a gratuitous donation. *Myers* vs. *Wade*; 6 Rand., 450.

*Sinclair* elects to charge these children, and to this end makes out his account against each respectively. What are his rights in those accounts when made out? Are they his own? or are they controlled by some legal or equitable principle?

They are his own, unless he has disposed of them as a payment on his bonds to the executor: or unless he can be forced to put them as a set off against the moneys due by these bonds.

Payment is a matter of fact to be proved, and it is not done.

To force a defendant to plead set-off is contrary to the spirit of the statute of set-off, which was made for the benefit not for the prejudice of the debtor; and it is within his election alone that the plea is put in.

1 E. C. L. Rep., 84. 8 Watt. 39. 9 Watt. 179. *Trimyer* vs. *Pollard*, 5 Gratt., 464–5. *Hudson* v. *Kline*; 9 Grat., 382.

Even if *Sinclair*, being sued by the executor on these bonds, desired, he could not be permitted by law to interpose the plea of a debt due from his *quasi* ward, as a plea of set-off to the action by the executor, because the claims are *in autre droit;* and neither bond was due at the time the accounts were made out and sold to appellant. Barbour on Set-off, page 19 and 54. *Harvey* vs. *Wood*; 5 Madd., ch. Rep. 1; American edition, 279.

*Mary A. Williams* was born in *Brooke* county, *Virginia*, of citizen parents; was herself a citizen, and continued such until her death, unless that citizenship was changed by the act of *Sinclair* taking her, at the age of about 11 years, to the State of *Ohio*. An infant cannot change its own domicil, because it cannot act *sui juris. Summerville* vs. *Summerville*; 5 Ves. 763 and 786–7. *Desesbats* vs. *Rurguire*, 1 Binn., 356; and *Guire* vs. *O'Daniels & Young*, 5 Binn., 349, *et sequel* 352–3. Philmore's Domicil, 31 § 55 and 56; Sto. Conf. L. § 46.

The father, and after his death, the mother while she remains a widow, can by a *bona fide* removal, *animus manendi*, of himself or herself from *Virginia* to *Ohio* change the domicil of their minor children.

On principle and in right reason that power must and should be conceded to the surviving mother, for she is then the head of the family. 3 Merivale, 79. And to this effect tend the best authorities, both of Europe and America; notwithstanding the mother's power, to effect such a change, was in the early period of the common law doubted.

Although it is, and of right reason should be conceded to the mother, while remaining a widow, and therefore the head of the family, the right to change the domicil of her infant child, by a *bona fide* change of her own; yet we insist that, neither according to reason or law can she possess or exercise such right or power, while *covert* by a second marriage. Since by the marriage the mother merges her civil existence both as a woman and mother, it is submitted that she destroys her power as guardian. 2 Kent, 232, note C, and note 2—citing *Palmer* vs. *Ouslsy*. 2 Doug. Mich. R. 433. Code 1860, page 588, § 7. Per force—not having legal custody, she cannot communicate as from herself, a legal right, which can only appertain to legal custody. Philmore, page 32, § 62—Sto. Confl't.—laws, § 46 and note 5, on page 57, and note 2, on page 58, and § 49, note 1. *Woodend* vs. *Paulspury*, 2 L'd Ray, 1473. *Freetown* vs. *Taunton*, 16 Mass., 51–2. *Dedham* vs. *Nalick, id.*, 134–139; *School Directors* vs. *James*, 2 Watt & Serg't, 568.

All these authorities are based on and arise out of the principal that, a *feme covert* cannot act *sui juris*, that her civil existence is merged in her husband, in, through and by whom all her personal duties must be performed. 2 Watt & Serg't, 570. *Sumner* vs. *Melton*, 2 Salk. Rep. 528. 2 Kent 532 on note (7ed.)

But if she cannot act *sui juris* as mother, she cannot act *sui juris* as guardian; for in that as in all other of her personal relations, her personal duties must be performed in, through and by her husband, who in the present instance is neither father nor guardian. She is like, or as impotent of legal action, as a guardian, who becomes insane, and therefore cannot act *sui juris*.

But the right and power of the guardian, as such, being

neither father nor mother, to change the domicil of his ward, it is submitted, has no place in the common law of either *England* or *America*, and especially *Virginia*.  As to *Virginia* it is a question *Res integra.*

Is there any case in either *England* or *America*, where the guardian, as a matter of common law, has been permitted to change the domicil of his ward?  It is submitted there is none, to the effect of changing succession.  It is further submitted that there should be none.

For in the *United States* domicil is citizenship—that which describes the one describes the other—the rights appurtenant to the one are appurtenant to the other.

The test of domicil.  1 Kent 84; *Schremshire* vs. *Schremshire*, 4 Eccle. Reps., 567.  Code, page 73–74.  Sto. Con'flt. of laws § § 43 et 44.  Philmore on domicil, page 16, chap. 2, including §§ 11, 12, 13, 14, 15 and 16.  Vattell, page 103. Settlement and domicil are synonymous.  Sto. Confl't. laws § 43 (note 7.)  1 Kent, 82.  2 Bouv., 519.  Vattell 103, § 210.

Test of citizenship.  1 Kent, 82, 83, 86.  Vattell, 101, §§ 212, 213, 214.  Sto. Confl't. laws, § 48.  *Gassies* vs. *Ballon*, 6 Pet. Rep. 751–2; *Brown* vs. *Keene,* 8 Pet. 112, 114.

Government cannot, in the exercise of a natural attribute, nor in the *United States* by a vested power, expatriate, banish, or exile a citizen except for crime.  A citizen of *Virginia* being twenty-one years old may leave it.  Code, page 74; § 3.

But government cannot force him to go, except as a punishment for crime.  It is inherent in all governments to banish or exile as a punishment, but not otherwise.

*Cooper* vs. *Telfair*, 4 Dallas, 14; 1 Cond. U. S. Rep., 211, 212, 213, and 214.  1 Kent, 599, 600, 604, 606–7 and 612 in exact point.  To the same effect is Vattell, page 103, § 218 and 220, and page 107, § 228.

Government cannot communicate or depute to its courts a power it does not itself possess—courts can only depute or exercise the jurisdiction conferred; and guardians can only exercise the powers conferred by the laws and by the courts.

Therefore the right in question, cannot on principle, be inherent in the guardian. And those conferred are only such as are necessary for protection, maintenance and education; and the power to change the domicil is not necessary to the complete performance of all these duties.

Confessedly, the power is not in the guardian by constitutional or statute law, the code being rather against it.

Is it in the guardian by common law?

On the continent of *Europe*, elementary writers on jurisprudence are divided. In favor of the existence of the power in the guardian are found *Bynkershoek*, *Rodenburg* and *John Voet* of *Holland*. To estimate the weight of all these authors, the reason upon which they all stand should be considered. It is that, the domicil of the minor is extinct, upon the death of the surviving parent. Phil. Dom. page 34; § 71—as cited by Phil. Dom., page 34.

But against it stands the powerful names of *Denisart*, *Mornac*, *Bouhier*, *Boullenois*, *Merlin*, quoted by Philm. Dom., page 34, note N., and *Pothier*, of *France*, and *Christinaeous*, of *Burgundy*; and all for the strong reason that, the ward is no part of the guardian's family—(only there *ad tempus*). To which may be added that the guardian has no natural dominion over the ward—(as a parent)—not bound to support it (as the parent,)—not entitled to its services (as the parent,) and it cannot be taken from the parent, but may be from the guardian.

In *England* it is submitted, there is no adjudged case, either conceding, allowing, or giving such power to the guardian; Phil. Dom. page 38; § 84, and where elementary writers speak of the power in a guardian, being a stranger, it is against it. 1 Burge; Col. & For. laws, Pt. 1 ch. 2, page 38–39.

Robertson on Succession, page 196 to 203. Cited by Sto. Confl. Laws, § 505, note 1; Phil. Dom., 31, also page 32, § 58, § 69, page 39, § 87, page 38, § 92.

The leading case of *Pottinger* vs. *Wightman*, 3 Merivale, 57 *et sequens*, was decided upon and with reference to the power of the surviving mother, and not the guardian and so

understood by the profession in *England*—see opinion of the court, 3 Merw. 79, 80 and; Phil. Dom. § 80, 82, and § 92.

In the *United States* it is thought and believed that there is no adjudged case allowing or conceding such power to the guardian; nor in fact any judicial dicta, *obiter* or otherwise, in favor of the doctrine, except the intimation of *Chancelor Kent*. 2 Kent Com. 234, note B. But there is against it the grave doubt of judge *Story*, and the adjudged case of the *School Directors* vs. *James*. 2 Watt & Serg't, Pa. Rep. 568.

*Z. Jacob*, for the appellees.

HARRISON, J. John Williams, of Brooke county, in the then State of Virginia, made his will bearing date on the 22d day of March, 1845, by which he directed all his estate to be sold on such terms as his executors should deem best for the benefit of his estate, and the money arising from the sale to be paid in equal proportions to his wife and his only children Mary and Caroline. He appointed his wife Elizabeth, executrix, and her brother William Brown, executor, of his last will, and his wife and Oliver Brown guardians of his children; and directed that they, (executor, executrix and guardians,) should not be required to give security.

At the April term 1845 of the county court of Brooke county, the will was admitted to probate, and the widow appeared in court and accepted the guardianship.

The widow and children resided at the homestead, called "Half Moon," in said county, where the testator had lived and died.

The widow intermarried with James Sinclair in January 1851, at her residence on said farm, and continued to reside there with the two children as members of the family, until 1852, when Sinclair and wife left Virginia and took up their residence in the State of Ohio. They carried the children with them to Ohio, and the four lived together there as one family, until June 1853, when Mary died in infancy: the mother and Caroline surviving her.

On the 25th of July, 1851, the executor, William Brown,

and the executrix, Elizabeth Sinclair, sold and conveyed to the said James Sinclair, a portion of the real estate of the testator for the sum of 10,800 dollars, and took from him two bonds, each for one-third of the purchase money, (after adjusting some accounts), amounting to 3,649 dollars and 50 cents each: one payable when Mary arrived at age, the other when Caroline arrived at age—both payable to Wm. Brown as executor, and both bearing interest from date, the interest payable annually from the 1st day of November, 1851.

No bond was taken from James Sinclair for his wife's third of the proceeds of sale; he executed a deed of trust, however, on the land, to secure payment of the two bonds and interest thereon, and this deed of trust was made on the day of the sale of the land.

It appears that James Sinclair supported Mary, from the time of his marriage with her mother, until her (Mary's) death, a period of about two years; and he has rendered an account against her estate for medical services and support, amounting to 1,500 dollars, and has assigned the same to the appellant Robert Mears, who filed his bill in the circuit court of Brooke county, against the administrator of Mary, and asks that the amount of the account be decreed to him, as also the share of the personal estate of Mary which her mother inherited from her deceased daughter, which James Sinclair and wife had assigned to him. The said Caroline has intermarried with C. C. Baakee, who with Sinclair and wife and sundry attaching creditors of James Sinclair are made defendants to the bill. The defendants Baakee and wife filed their answer, and insist that the personal estate of Mary, passed after her death, to Mrs. Baakee, according to the law of descents of the State of Ohio. On the other hand, Mears insists that it passed, at her death, to her mother and Mrs. Baakee, according to the statutes of descents and distributions of the State of Virginia.

The case involves the inquiry, whether Mary, who was born in Virginia and domiciled here, became domiciled in

Ohio, under the facts above stated; or in the language of counsel who have argued the cause in this court, where, in contemplation of law, was the domicil of Mary at the time of her death?

The numerous authorities cited in argument establish these propositions: that the home or domicil of a father, is the domicil of his infant children; and so as to the mother, while sole—her domicil is theirs.  Parents have a right to choose a domicil for themselves; infant children have not such right; their domicil is derived from that of their parents.  A guardian cannot fix the domicil of his ward.  Can a mother, while under coverture with her second husband, a stranger in blood and estate to his infant step-children, change their domicil?  Can a second husband take his infant step-child from its native State, where it is domiciled, and carry it into another State, thereby changing its domicil, and alter the succession of its estate?

This being the only serious question made and argued in the cause, I have come to the conclusion that the marriage of James Sinclair with the mother of Mary, and carrying Mary from her native State (Virginia,) to the State of Ohio, and remaining there until her death, did not so change her domicil as to alter the succession and distribution of her personal estate in Virginia; it must be distributed according to the Virginia law of descents and distributions,—not that of Ohio.

The decree of the circuit court of April 4th, 1830, deciding "that the personal estate of said Mary passed at her death, to said Caroline, to the exclusion of the mother, according to the laws of Ohio," is, in my opinion, erroneous and should be reversed, and the cause remanded to the circuit court for proceedings in accordance with the principles herein stated.  I am further of the opinion that, the accounts of James Sinclair and wife for maintenance, &c., of the children Mary and Caroline, and assigned to the appellant Mears, are in themselves just and proper and ought to be allowed; provided there was any fund out of which they could be satisfied; but inasmuch as it appears that the

indebtedness of James Sinclair to the estate of his wards, after applying the proceeds of the "Half Moon" farm, exceeds the amount of these accounts, the circuit court did not err in rejecting them, as there was no fund in the power of the court, applicable to their payment.

The other judges concurred in the opinion of Harrison, J.

DECREE REVERSED; and the cause remanded to the circuit court for further proceedings.